FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ AUG 28 2014 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

                                       **MEMORANDUM & ORDER**

MAIR FAIBISH,                              12-cr-265 (ENV)

                      Defendant.
-----------------------------------------------------------x

**VITALIANO, D.J.,**

       On March 14, 2014, a jury returned a verdict convicting Mair Faibish of the crimes of conspiracy to commit bank and securities fraud, bank fraud, and making false statements to the Securities and Exchange Commission ("SEC"). Having sought and having been granted an extension of time to do so, on May 16, 2014, Faibish renewed his motion for a judgment of acquittal, under Federal Rule of Criminal Procedure 29, and, in the alternative, moved for a new trial, pursuant to Rule 33. For the reasons that follow, the motions are denied.

The Evidence at Trial

       Over the course of the trial, which spanned nearly three weeks, the government called 14 witnesses and introduced more than a thousand exhibits, including checks, invoices, bank statements, and charts of account, to show that Faibish had, together with others, defrauded Capital One Bank, Signature Bank, and the investors and shareholders of Synergy Brands Inc.[1] Faibish was the Chief

---

[1] Familiarity of the parties with the facts and proof at trial is presumed. Hardly

1

Executive Officer of Synergy Brands and PHS Group Inc. (collectively "Synergy"). Between April 2007 and October 2009, with the connivance of Giuseppe Gatti, who controlled a number of companies in Canada (the "Gatti companies"), Faibish used Synergy as a vehicle to execute a $1.3 billion "check kiting" scheme. At its essence, Faibish and Gatti schemed to, and did, circulate "worthless" checks among the many companies under their control, taking advantage of instantaneous cash availability privileges at Capital One Bank and Signature Bank, that artificially inflated their account balances. The effect of those privileges was magnified by the longer clearance time for the presentment of checks moving between Canada and the United States. By tapping account balances quickly, in a classic check kite, the kiters used the banks' money, in circular fashion, to support a check drawn on an account in one bank, artificially inflated by a check drawn on an account artificially inflated in another bank. The accounts were without sufficient real funds to pay all of the checks drawn on them. So long as Gatti and Faibish could move checks, with the window dressing of instant availability, and within the ordinary check clearance float, detection by the banks would be exceedingly difficult. Simultaneously, Faibish and Gatti sought, unsuccessfully, to further secret their scheme by engaging in a series of fictitious, indeed fanciful at times, transactions between Synergy and the Gatti companies, creating off-setting invoices, checks, and accounting records, hoping to add a sense of business regularity to hide their swindle. These false

---

intended to be exhaustive, the background details sketched here are offered as a real world context for the legal conclusions the Court finds controlling on defendant's motions.

business records led directly to an inflation of the value of Synergy, and a fraud on its investors and shareholders. These falsehoods were later passed on, at Faibish's direction, to Synergy's auditors, which, naturally, resulted, again with Faibish's knowledge and approval, in false filings with the SEC.

As the proof made obvious, check kiting was the mother's milk that gave life to all of Faibish's other criminal misdeeds. Guiseppe Gatti, Faibish's partner in crime, provided more than enough proof for the jury to find Faibish guilty of the kite itself. To be sure, given that kiting is normally steeped in cover-up, Gatti had, at one time, professed the business regularity of the dealings between the Gatti companies and Synergy. Indeed, Faibish had hoped to use Gatti's profession of business regularity in his defense. But, during the course of Faibish's prosecution, Gatti was separately indicted in this district for the same scheme. Then, he pleaded guilty, pursuant to a cooperation agreement, and testified against Faibish. In his testimony at Faibish's trial, Gatti explained how he had acquired his businesses in Canada, and through one of them, Loretta Foods, come to develop a business relationship with Faibish and Synergy. (Tr. 368-73). He then described, in intimate detail, how he and Faibish embarked on their cross-border check kiting, and how they maintained vigilant watch over the float, check issuance, check deposit, and the creation of invoices and other business documents, to cover it up. *See, e.g.*, (Tr. 375-82). In addition to supplying each other with phony documentation, to "provide some sort of substance to the check," or "fluff for the auditors," Faibish and Gatti would, as Gatti testified, send to the other a supply of signed, blank checks drawn on his own company as to be strategically completed and deposited in the opposite

3

account holder's account. *See, e.g.*, (Tr. 378–82; 386-92; 411-12; 499–500). The circulation of checks was carefully monitored on a daily basis, and Faibish and Gatti remained in constant daily contact, Gatti explained, to avoid "collapse"—a series of bounced checks. (Tr. 383, 404). So long as the checks continued circulating ahead of the float, Faibish and Gatti could—and did—manipulate the artificially inflated balances to purchase additional inventory. (Tr. 446).

The inevitable collapse came in October 2009, when Laurentian Bank, which held the accounts of the various Gatti companies, grew suspicious and placed a number of deposits on hold, forcing Gatti to stop payment on a number of checks previously furnished in blank amount to Faibish. (Tr. 415). A cascade of bounced checks followed. Later, when the music stopped playing, Signature Bank was the biggest player without a chair—to the tune of $3 million. (Tr. 416).

Gatti's damning tale was more than amply corroborated by other evidence. For example, Special Agent Richard Branda, of the Department of Homeland Security Investigations, recounted episodes of suspicious dealing between businesses controlled by Faibish and those controlled by Gatti. In one episode, according to trade documentation and the accompanying kited checks, Branda testified, G&R Auto Repair was to have made $83 million in purchases of flour from a company controlled by Gatti. (Tr. 38). Agent Branda testified further that import records showed that no such flour ever crossed the border, nor did any other record of any of the companies verify even the existence of the flour, much less its ultimate trade disposition. *Id.* In another bizarre account, related by Agent Branda's fellow investigator, Nassau County Police Detective Patrick Rail, some 30,000 pounds of

4

sugar was purportedly shipped to a company called Libra Marketing at Faibish's Long Island home address. (Tr. 768-69). And, in an equally bizarre deal, Christopher Dillon, a former investigator with Capital One Bank, testified that certain phony invoices detailed massive purchases, by a Faibish company, of wheat, supposedly grown in Brazil, but traded by way of Pakistan, from a company owned by Gatti. (Tr. 285-89).[2]

The phony transactions between Synergy and the Gatti companies that served to hyper-inflate the cash balances and cash flow for the bank accounts of the various companies, and disguise the check kiting scheme, bled through and corrupted Synergy's auditing records. Actual business transactions among the companies came nowhere close to the level of business the fraudulent records of cash flow and cash balances reflected. Synergy investors told of personal confirmation by Faibish of the good news reported in Synergy's SEC filings, prompting shareholders to double down on their investments in Synergy. *See, e.g.*, (Tr. 794, 841). The jury heard from Eric Fangmann, an expert in accounting and corporate finance, who had been retained by the Synergy board of directors to assess the company's prospects, that, following an investigation that included repeated assurances of propriety by Faibish, the rosy picture painted in Synergy's SEC filings was a fraud.[3]

---

[2] Additional support for the existence of the Faibish-Gatti check kiting scheme was offered by investigators for the victimized banks and Detective Rail. Detective Rail, in particular, provided a damaging account of a spreadsheet seized by him from Faibish's personal office, which chronicled the many transactions that were the check kiting scheme. *E.g.*, (Tr. 698-705, 711, 745).

[3] Faibish called Kenneth Katzman, an independent expert in accounting, as a

5

Arrest, prosecution, and, now, conviction followed.

## Controlling Law

### A. The Crimes Charged

#### 1. Conspiracy

The crime of conspiracy requires: "(1) an agreement among the conspirators to commit an offense; (2) specific intent to achieve the objective of the conspiracy; and (3) . . . an overt act to effect the object of the conspiracy." *United States v. Pinckney*, 85 F.3d 4, 8 (2d Cir. 1996). To satisfy a conspiracy conviction, "the record must ... permit a rational jury to find: (1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008); *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008). "Although the government need not prove commission of the substantive offense or even that the conspirators knew all the details of the conspiracy, it must prove that the intended future conduct they agreed upon includes all the elements of the substantive crime." *Id.* (quoting *United States v. Rose*, 590 F.2d 232, 235 (7th Cir. 1978), *cert. denied*, 442 U.S. 929 (1979)) (internal citations and quotations omitted). Because a conspiracy is by its nature secretive, "it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel," *United States v. Pitre*, 960

---

defense witness. At best, Katzman's testimony was a push; at worst, yet another nail in the coffin, when Katzman, confronted with some of the evidence detailed above, expressed his own "great skepticism" at the veracity of Synergy's filings. (Tr. 959–60).

F.2d 1112, 1121 (2d Cir. 1992) (internal citations omitted), and a defendant can be convicted of conspiracy entirely on the basis of circumstantial evidence. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

2. <u>Securities Fraud and Bank Fraud</u>

The laws governing the offenses of securities fraud and bank fraud are closely related. The crime of securities fraud "requires proof of three elements: (1) fraudulent intent, (2) a scheme or artifice to defraud, and (3) a nexus with a security." *United States v. Mahaffy*, No. 05-cr-613, 2006 WL 2224518 (E.D.N.Y. 2006). Similarly, the offense of bank fraud involves an intentional scheme or artifice to defraud a federally chartered or insured bank. *See United States v. Barrett*, 178 F.3d 643, 647–48 (2d Cir. 1999). An intentional scheme to defraud need not actually succeed in victimizing anyone in order to be illegal, for "the [relevant] statute[s] make[] an individual criminally culpable for devising and executing or attempting to execute such a scheme with the intent" to defraud. *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992); *Mahaffy*, 2006 WL 2224518, at *16. A defendant need not intend that the banks lose money, but must merely place a bank at risk of loss. *See United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998). In the particular case of a check kiting scheme, bank fraud is perpetrated when

> a person knowingly deposits a worthless check which is immediately credited to the depositor's account.... In the meantime, a check is drawn on the inflated balance and deposited into another account that is involved in the kiting scheme. This process is continued in a circular manner, usually among a number of accounts, to stave off the bank's recognition that there are insufficient funds to cover the checks.

7

*United States v. Burnett*, 10 F.3d 74, 76 (2d Cir. 1993).

3. False Statements to SEC

A defendant is criminally liable for making a false statement to the SEC when he knowingly and willfully made a materially false or misleading statement in any application, report, or document required to be filed with the SEC. 15 U.S.C. § 78ff(a). While there is no bright-line rule for materiality, *Basic v. Levinson*, 485 U.S. 224, 236 (1988), material facts are those "that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Basic*, 485 U.S. at 231).

B. Motion for Judgment of Acquittal

In a challenge to the sufficiency of evidence to support a conviction, "a defendant bears a heavy burden." *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003). Indeed, the conviction *must* be upheld if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). All permissible inferences must also be drawn in favor of the government, including determinations relating to the credibility of a witness. *See id.*; *United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007); *United States v. Temple*, 447 F.3d 130, 136–37 (2d Cir. 2001). The testimony of a sole accomplice witness, moreover, may support conviction so long as it is not "incredible on its face" and is "capable of establishing guilt beyond a reasonable doubt." *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006). Circumstantial

evidence alone can likewise form the basis of the jury's verdict. *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1999).

A defendant's burden is even heavier in the case of a conspiracy conviction; "deference to a jury's findings is especially important . . . because a conspiracy is by its very nature a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006). A defendant may properly be found guilty of conspiracy "even if he knows only one other member of the conspiracy, and a single act may be sufficient for an inference of involvement in a criminal enterprise . . . if the act is of a nature justifying an inference of knowledge of the broader conspiracy." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008). Put differently, the steep hill to success on a Rule 29 motion is steeper still when the crime of conviction is conspiracy.

## C. Motion for New Trial

Rule 33 allows a district court "to vacate any judgment and grant a new trial if the interest of justice so requires," Fed. R. Crim. P. 33(a), and the Second Circuit has held that, in considering a motion for a new trial, "the court is entitled to 'weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.'" *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). On the other hand, the trial court may not wholly usurp the jury's rule, and it is only "where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)

(internal quotations omitted); *Robinson*, 430 F.3d at 543. Thus, while a decision to grant a new trial is reviewed for abuse of discretion, *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001), the trial court's freedom to reverse the credibility assessments of the jury is limited.

Put another way,

> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice." Although a trial court has broader discretion to grant a new trial pursuant to Rule 33 [of the Federal Rules of Criminal Procedure] than to grant a motion for a judgment of acquittal pursuant to [Rule] 29 [of the Federal Rules of Criminal Procedure], where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly.

*United States v. Bell*, 584 F.3d 478, 483–84 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (alterations in original)).

## Discussion

### A. Rule 29 Motion

Faibish's Rule 29 motion attacks the legal sufficiency of the evidence proving his intent to defraud anyone. The argument is virtually a nonstarter. The Second Circuit has noted, "[i]ntent may be proven through circumstantial evidence, including by showing that defendant made misrepresentations to the victim(s) with

10

knowledge that the statements were false." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). A defendant carries an especially heavy burden on a Rule 29 motion challenging proof of intent:

> The government need not exclude every reasonable hypothesis other than that of guilt. . . . In other words, the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. The jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (emphasis in original) (internal citations and quotations omitted). In attacking his convictions on Counts One and Two, Faibish submits that "no rational juror could conclude beyond a reasonable doubt that [he] knew the NDT [a Gatti company] checks would not clear [when he deposited them in a Synergy account]." To this end, Faibish claims to have had no reason to believe that the checks were "worthless," since they had cleared in the past without incident. Relatedly, with respect to Counts One and Three, Faibish argues that the prosecution failed to show that certain sales of flour were fictitious, so as to render statements to investors and the SEC false. He claims to have simply engaged in an innocent funding arrangement with Gatti, which derailed, essentially, as a result of a third-party default. Closing the loop, he asserts further that the invoices supporting the funding arrangement were not fictitious at all, but represented actual dealings.

The next building block in the defense's challenge to the convictions is the characterization of Gatti's testimony as contradictory and illogical, prefacing the

11

argument that the jury could only have been convinced of his guilt by Detective Rail's "unsubstantiated opinion" testimony that check kiting had occurred. Faibish points to the testimony of Terry Mak, who helped keep Gatti's books, Michael Falcone, who was Synergy's Chief Financial Officer, and Gatti, as confirming that a legitimate funding arrangement had existed. This testimony, Faibish argues, makes reasonable doubt, for any rational juror, inescapable. On another front, Faibish similarly attacks the government's bedrock reliance on proof that the dealings among the cross-border trading parties was fictitious. A rational juror could not overlook that there was nothing to disprove that, for example, the companies entered into arrangements "to buy and sell [] without delivery."

Hop-scotching across the record to latch on to hopeful glimmers is not the Rule 29 standard of review. The record is replete with hard evidence that Faibish intentionally embarked a scheme with Gatti to kite checks, and that he knew that the checks exchanged among his companies and the Gatti companies were supported by manipulation of the "float" and not in cash. There is no more powerful proof than the testimony of Giuseppe Gatti, Faibish's partner in crime, that check kiting was exactly what the two had agreed to and did engage. That there may be some records that arguably support a different conclusion does not matter a whit.[4] There was mounds of evidence describing business practices that made

---

[4] Faibish also attempts to inject new evidence into the record on this motion, in the form of further, post-trial analysis from his accounting expert, Olga Averin, of the bank accounts in question. Not only is this gambit improper, it is futile: the Court

absolutely no sense in a legitimate business context—the exchange of blank, signed checks to be deposited in orchestrated fashion to keep the float alive, backed by phony invoices reflecting deals that not only did not happen but, from a physical sense, could not have happened, involving such absurdities as totes of flour that could not fit in the hold, and the transport of wheat through Pakistan, or to an auto body shop in Long Island. There was the record meticulously chronicling the deposit of checks. Also, there was the testimony of the results of internal bank investigations into the suspicious activity in Synergy's checking accounts; the investigatory findings of Special Agent Branda and Detective Rail. The list goes on and on and on.

To be sure, Faibish attacks Gatti's testimony in this motion as vigorously as it was attacked on cross-examination, especially as it was at odds with Gatti's prior testimony in a civil case, before Gatti gave up the ghost and entered into his cooperation agreement with the government. All of the reasons why Gatti might not be a trustworthy witness were laid bare before the jury. But, it is equally clear, the jury did believe him. *See United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir. 1995) ("we are required to resolve any issue regarding [a government witness's] credibility in the government's favor"); *United States v. Friedman*, 998 F.2d 53, 57 (2d Cir. 1993) (a jury is "entitled to conclude that [defendant's] version of the events

---

cannot and will not overrule the jury's decision to credit the government's trial evidence, which strongly evinced that the checks circulated in the scheme alleged in the indictment were drawn against insufficient and artificially inflated balances.

was false and thereby infer [his] guilt"). Dispositively, it cannot be said that Gatti's testimony was "incredible on its face." *Florez*, 447 F.3d at 155. His testimony gave zest to the plainness of the contrived process that was the fraud. He gave the jury voice to all he and Faibish perpetrated. None of his testimony was out of harmony with the rest of the proof. It was more than enough to support a rational fact finder's determination of guilt. It is, especially with the powerful support of other evidence, more than enough to disable the Court from assessing the proof deficient under Rule 29. When resolving all questions of credibility and conflicting testimony in favor of the government, as the Court must, it is abundantly clear that sufficient evidence supported the jury's verdict on all counts. For all of the foregoing reasons, defendant's Rule 29 motion is denied.

## B. Motion for a New Trial

Faibish also bemoans a perceived unfairness in his trial, asserting that the prosecution developed a "stealth strategy" to "sabotage the defense effort," and moves for a new trial on those grounds. In particular, defendant accuses the government of underhandedly manipulating Gatti into testifying against him, in contradiction of the witness's earlier sworn testimony. Faibish also takes aim at Detective Rail, whose testimony he characterizes as an improperly-admitted and unduly-prejudicial expert account, which he believes was disproven by his own expert. Defendant additionally complains about various other evidentiary rulings made by the Court over the course of trial. These alleged failures of process, individually and in concert, defendant submits, served to deprive him of a fair trial.

Faibish's first shot at the fairness of his trial is aimed at the timing of Gatti's indictment, for conspiracy and bank fraud, on April 18, 2013. He argues that it was a mid-course ambush; prosecutorial misconduct mandating, at minimum, a new trial. But, the timing of Gatti's indictment is of no concern to Faibish, nor of any moment in this motion. That Gatti chose to plead guilty and cooperate against Faibish was, obviously, devastating. It is equally obvious that the government cannot be faulted for endeavoring to bring Gatti, as well as Faibish, to justice. The government's deal with Gatti provided advantage against Faibish—but without breaking any canon of fairness. The antidote was vigorous cross-examination of Gatti. That happened in spades, yet the jury chose to credit Gatti. It results in conviction, not a new trial.

Next under the gun is Detective Rail, a summary fact witness, whom defendant challenges for offering improper expert testimony, at great prejudice to the defense, which did not contemplate such expert testimony from a fact witness.[5] In summarizing his investigative findings, Detective Rail simply described check kiting, as he understood it from his experience and reported what certain facts he "believed" to have occurred as he applied that expertise in his investigation. *See, e.g.* (Tr. 689, 720, 747). Such testimony cannot be characterized as offering an expert opinion. *See United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) ("A witness's

---

[5] Defendant also claims that he was not provided with copies of the summary charts Detective Rail relied on in describing the check kiting scheme. The government flatly denies this, and defense counsel's own statements on the record appear at odds with his representations on the instant motion. *See, e.g.* (Tr. 715).

specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony 'expert' as long as it was based on his investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise"). Furthermore, Detective Rail's account of his check kiting summary findings was one entirely consistent with the testimony of other witnesses and with the Court's charge to the jury on that point. If the detective's testimony "provided the jury with an easy resolution of a complex three week trial," as defendant now argues, it was because the evidence against him was more than considerable, and the government used Detective Rail to great success as a summary fact witness, which did, apparently, impress the jury. Effective testimony—yes; improper, unnoticed expert testimony—no.

Finally,[6] Faibish launches a scattershot assault against various exhibits and statements admitted into evidence, including exhibits admitted without objection, characterizing them as unduly prejudicial and misleading. None of these complaints have merit. All told, Faibish has failed to offer any reason to conclude that his trial was fundamentally unfair, or that competent evidence does not exist on the record to support the jury's findings of guilt on all counts. No relief under Rule 33 is warranted.

## Conclusion

---

[6] To the extent that defendant's reply brief attempts to add still more rambling evidentiary objections and accusations of prosecutorial misconduct to the mix, they are not properly raised on this motion. Even if they were, they are entirely without merit.

In line with the foregoing, Faibish's motions under Rule 29 for a judgment of acquittal and, in the alternative, under Rule 33 for a new trial, are denied. Any and all other pending trial motions are also denied.

The pre-sentence investigation by the United States Probation Office shall proceed in the ordinary fashion. After the resulting Pre-Sentence Report has been prepared, distributed, and reviewed by all parties, Case Manager William Villanueva shall calendar a sentencing hearing on a mutually convenient date.

SO ORDERED.

Dated: Brooklyn, New York
August 25, 2014

s/Eric N. Vitaliano
───────────────────
ERIC N. VITALIANO
United States District Judge